Chemetron Corporation v. Commissioner.
Chemetron Corp. v. Commissioner
Docket No. 72896.
United States Tax Court
T.C. Memo 1960-269; 1960 Tax Ct. Memo LEXIS 22; 19 T.C.M. (CCH) 1497; T.C.M. (RIA) 60269; December 13, 1960
Jack B. Moore, Esq., Prudential Plaza, Chicago, Ill., for the petitioner. Erving Sodos, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income tax in the amounts of $33,969.51 and $40,527.97 for the years 1953 and 1954, respectively. The issue for decision is whether gains which resulted from the sale of certain property by the petitioner, a part of which was received in the taxable year 1953 and a part in the taxable year 1954, are taxable to petitioner as long-term capital gains or as shortterm capital gains. Findings of Fact The stipulated facts *23 are incorporated herein by reference. The petitioner was incorporated under the laws of the State of Delaware and at the time of the filing of the petition in this case was known as National Cylinder Gas Company, hereinafter referred to as N.C.G. The articles of incorporation were amended in 1859 and the petitioner's name was changed to Chemetron Corporation. Its principal offices are located at Chicago, Illinois. The petitioner's 1953 corporate income tax return was filed with the director of internal revenue, Newark, New Jersey, and the petitioner's 1954 corporate income tax return was filed with the director of internal revenue, Chicago, Illinois. Both returns were prepared under an accrual method of accounting. During the taxable years in question and up to the present time, the petitioner has been engaged in the production of various compressed industrial gases for sale to industry, the manufacture of welding supplies and equipment, and related activities. In late 1949, in connection with retaining the services of a patent law firm the petitioner became advised of certain patent applications which were in conflict with those of the petitioner. These patent applications were *24 the property of Robert Klotz, hereinafter referred to as Klotz, and dealt with a new "jet process" used in connection with oil wells. The jet process was the forming of holes in the casings of oil or gas wells by shaped explosive charges so as to let the oil or gas into the casing. One of petitioner's subsidiaries, Perforating Guns Atlas Corporation, operated in a field in which these patent applications could be utilized. Negotiations were initiated and conducted and resulted in the following agreement: OPTION AGREEMENT AGREEMENT made and entered into as of the 1st day of September, 1950, by and between NATIONAL CYLINDER GAS COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Delaware, having an office at Chicago, Illinois, (hereinafter called "NCG"), and ROBERT L. KLOTZ, a resident of Drums, in the County of Luzerne and State of Pennsylvania (hereinafter called "KLOTZ"); WITNESSETH: WHEREAS, KLOTZ has made certain inventions described and claimed, or intended to be described and claimed in the following applications for Letters Patent of the United States: Serial No. 729,654, filed February 19, 1947 for METHOD AND APPARATUS *25 FOR DRILLING BOREHOLES; Serial No. 729,655, filed February 19, 1947 for @APPARATUS FOR PERFORATING WELL CASINGS; and Serial No. 179,363, filed August 14, 1950 for EXPLOSIVE DEVICE. which inventions and applications relate, generally, to operations that may be performed in boreholes and the like employing shaped explosive charges or explosive charges having one or more cavities formed therein and intended to utilize the so-called "Munroe effect" or "jet effect", the said subject matter being herein referred to generally as the "Jet Process"; and WHEREAS, NCG is desirous of acquiring an option to purchase said inventions, said applications, and any and all United States Letters Patent which may issue on or as a result of said applications, and KLOTZ is willing to grant such an option to NCG on the terms and under the conditions hereinafter set forth. NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00) in hand paid to KLOTZ by NCG, the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter set forth, the parties do hereby covenant and agree as follows: 1. KLOTZ hereby grants to NCG the irrevocable option and privilege of acquiring *26 in the manner and subject to the terms hereinafter set forth, an assignment of the entire right, title and interest in and to said inventions and applications for Letters Patent, including any and all divisions or continuations thereof, and in and to any and all United States Letters Patent which may issue on or as a result thereof including any reissues or extensions thereof. 2. The option granted in Article 1 hereof shall endure for a period extending to and terminating upon the issuance of United States Letters Patent on or as a result of said application Serial No. 729,655, but said option may be terminated or exercised by NCG at any time during the life of the option by written notice sent by registered mail to KLOTZ. 3. In consideration of the option granted in Article 1 hereof, NCG agrees to pay to KLOTZ the sum of One Hundred Dollars ($100.00) per month from the date hereof and to assume all responsibility for and any and all expense incurred in the continued prosecution of said applications during the entire period in which the said option remains unterminated, unexercised or unexpired. 4. KLOTZ agrees that in the event that (a) NCG expends a sum of money in excess of *27 Five Thousand Dollars ($5,000.00) on the aforesaid applications, including the expense of prosecuting the said applications and certain payments made or to be made by NCG to SEISMOGRAPH SERVICE CORPORATION of Tulsa, Oklahoma under the terms of a certain letter agreement effective of even date herewith and relating to said applications, but excluding the payments of One Hundred Dollars ($100.00) per month made by NCG to KLOTZ under the provisions of Article 3 hereof, and (b) NCG either elects in writing to terminate the said option or permits the said option to expire upon issuance of United States Letters Patent on or as a result of application Serial No. 729,655, then, upon the happening of both (a) and (b), NCG shall have, and KLOTZ hereby grants and agrees to grant to NCG, a paid-up, non-exclusive license under the aforesaid inventions, applications, and United States Letters Patent, which license shall be nontransferable by NCG except as provided in Article 6 hereof. 5. In the event that NCG exercises the aforesaid option prior to the expiration thereof, then the following terms and conditions shall immediately become operative: (a) KLOTZ shall execute and deliver to NCG a *28 written assignment of the entire right, title and interest in and to the aforesaid inventions, applications and United States Letters Patent; (b) NCG agrees to pay to KLOTZ from the date of exercise of the said option until the expiration of the last to expire of the aforesaid Letters Patent, royalties in the following amounts: (1) In the event that NCG grants outright, non-exclusive licenses to others in consideration of which NCG receives only royalties, then the royalties collected by NCG under such license or licenses, shall be divided equally between NCG and KLOTZ; provided, however, that in the event the royalty rate established for the licensee or licensees under such license or licenses, is in any case less than five percent (5%) of the gross revenues received by such licensee by virtue of commercial operations under the license or the equivalent thereof, then the royalty payments to KLOTZ shall be at a rate to be agreed upon, and in the event a rate satisfactory to both parties cannot be agreed upon, it shall be determined by arbitration in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon the award may be entered in any *29 Court having jurisdiction thereof. (2) In the event that NCG enters into any written contract under the terms of which its subsidiary PERFORATING GUNS ATLAS CORPORATION receives a reduction in its present rate of royalties payable to another or to others with respect to the "Jet Process", which reduction is evidenced in writing to result from NCG's ownership of the aforesaid inventions, applications and United States Letters Patent, then the savings to PERFORATING GUNS ATLAS CORPORATION in such royalties shall be shared with KLOTZ on the basis of royalty payments to KLOTZ according to the following schedule: Royalty Payable to Others
Payable to KLOTZ
10% or more of "service fees"
Nothing
9% or more of "service fees"
$ 1,000.00 per year
8% or more of "service fees"
2,000.00 per year
7% or more of "service fees"
3,000.00 per year
6% or more of "service fees"
4,000.00 per year
5% or more of "service fees"
5,000.00 per year
4% or more of "service fees"
7,500.00 per year
3% or more of "service fees"
10,000.00 per year
2% or more of "service fees"
15,000.00 per year
Less than 2% or more of "service fees"
15,000.00 per year or 1% of "service
fees", whichever is greater.
*30 The term "service fees" as used in the foregoing schedule shall be understood to mean those fees for services performed by PERFORATING GUNS ATLAS CORPORATION involving the "Jet Process" that form the basis for computing royalties payable to another or to others by PERFORATING GUNS ATLAS CORPORATION, however defined in the agreement or agreements by virtue of which such royalties are payable. It is further understood and agreed, however, that if the savings to PERFORATING GUNS ATLAS CORPORATION are such that the royalty payments to KLOTZ specified in the foregoing schedule amount to more than ten percent (10%) of the actual decrease in royalties payable to another or to others by PERFORATING GUNS ATLAS CORPORATION, then the royalty payable to KLOTZ pursuant to this subparagraph (b)(2) of this Article 5 shall be decreased to and payable at the rate of, and shall amount to only, ten percent (10%) of the actual savings to PERFORATING GUNS ATLAS CORPORATION in its royalty payments to another or to others during the next preceding accounting period as specified in sub-paragraph (c) of this Article 5. (c) NCG agrees to keep accurate records from which the royalties due to KLOTZ under *31 the provisions of subparagraph (b) of this Article 5 of this agreement may be determined, and to furnish KLOTZ within thirty (30) days after the end of each calendar quarter a written statement showing the amount of royalties due for such quarter, and to accompany each such statement with payment to KLOTZ of the royalties shown thereby to be due. (d) NCG shall have the right to recover from the royalty payments due to KLOTZ under the provisions of subparagraph (b) hereof, NCG's investment in the aforesaid applications and United States Letters Patent (exclusive of the said payments of One Hundred Dollars ($100.00) per month to KLOTZ for the option herein granted) up to a total of Seventy-five Hundred Dollars ($7,500.00), but such deductions from royalties shall in no event exceed fifty percent (50%) of the royalties or payments due to KLOTZ in any accounting period. 6. This option agreement and the license provided in Article 4 hereof shall be binding on and shall inure to the benefit of NCG and its subsidiary and affiliated companies (which for the purposes hereof shall be deemed to be any company or corporation more than fifty percent (50%) of whose voting shares of stock are *32 owned or controlled directly or indirectly by NCG), but this agreement and the said license shall not otherwise be assignable by NCG without the prior written consent of KLOTZ. 7. This option agreement shall be binding on and shall inure to the benefit of KLOTZ and his heirs or legal representatives, but shall not otherwise be transferable or assignable by KLOTZ without the prior written consent of NCG. 8. During the entire period in which the option granted in Article 1 hereof remains unterminated, unexercised or unexpired, KLOTZ covenants that he will not sell, assign transfer, pledge, mortgage or hypothecate, or by any other act or means, whether direct or indirect, impair or divest himself of any of his past, present or future right, title and interest in, to and under the aforesaid inventions, applications and United States Letters Patent except with the prior written consent of NCG, and KLOTZ further covenants that any transfer by him at any time of any of his right, title and interest in, to and under the aforesaid inventions, applications and United States Letters Patent will be by him made expressly subject to the license to NCG provided for in Article 4 hereof. * *33 * *
After procuring the option agreement, hereinafter referred to as the 1950 Agreement, petitioner retained patent counsel who worked towards getting patents granted on the Klotz applications. Subsequently, one of the patent applications, No. 729,655, became involved in an interference proceeding (Interference No. 85,220) with a patent in the name of Muskat (U.S. Patent No. 2,494,256) which was controlled by Byron Jackson Company, hereinafter referred to as B. J., a Delaware corporation having its office and principal place of business in Los Angeles, California. Negotiations to resolve this interference proceeding were carried on between the petitioner's patent counsel and B. J.'s attorney. The petitioner by letter in February 1952 made an offer to B. J. in the hope of terminating the interference proceeding. The offer was not accepted and negotiations by telephone and in person continued between the parties. Petitioner believed that any agreement that it negotiated with B. J. would be different from anything that had been contemplated when the 1950 Agreement was negotiated with Klotz. Therefore Klotz and Boynton, petitioner's patent counsel, in April orally agreed to alter *34 certain provisions of the option contract. The oral agreement was to be made into a formal contract if a satisfactory settlement with B. J. could be negotiated, the original contract to remain in effect until that time. By letter dated June 2, 1952, Boynton advised Klotz that he had conferred with his client's superiors as to the revisions and they were acceptable. The petitioner anticipating a settlement with B. J. entered into the following letter agreement with Klotz on October 16, 1952. The terms of this writing were in conformity with the previous agreement between the parties. The pertinent sections of this letter are: Please refer to the Option Agreement dated September 1, 1, 1950 between yourself and this company (identified therein as KLOTZ and NCG, respectively). In view of the present status of the negotiations looking to the possible settlement of interference No. 85,220, it now seems advisable that we enter into this supplemental agreement with respect to the various points that have been covered in our conversations and earlier correspondence. These are: A. In accordance with Paragraph 6 of the Option Agreement identified above, KLOTZ hereby gives his consent to *35 the assignment of the rights of NCG under said Option Agreement to Byron Jackson Co. or Welex Jet Services, Inc., or both. B. KLOTZ hereby agrees to execute an abstract of the said Option Agreement in the form requested by NCG, which abstract may be used by NCG to establish its essential rights under the said Option Agreement in connection with an assignment of its rights as contemplated by Paragraph "A", above. C. In the event that NCG assigns its rights under the said Option Agreement as contemplated by Paragraph "A", above, NCG thereupon waives its right to recover any part of its investment in the subject matter of the said Option Agreement as provided in Paragraph 5, sub-paragraph (d), and KLOTZ and NCG mutually agree that the said Paragraph 5, sub-paragraph (d) shall in that event be cancelled and expunged from the said Option Agreement. D. In the event that NCG assigns its rights under the said Option Agreement as contemplated in Paragraph "A", above, NCG waives its right to receive the paidup, non-exclusive license under the subject matter of the Option Agreement as provided in Paragraph 4 of the said Option Agreement. E. In the event of the assignment by NCG of its *36 rights under the said Option Agreement as contemplated by Paragraph "A", above, KLOTZ and NCG mutually agree that any provisions of the said Option Agreement to the contrary notwithstanding, KLOTZ shall receive from NCG six percent (6%), and only six percent (6%), of any and all sums of money received by NCG or subsidiaries as consideration for such assignment. F. In the event that NCG shall not assign its rights under the said Option Agreement as contemplated by Paragraph "A", above, KLOTZ and NCG mutually agree that this supplemental agreement and the abstract of the said Option Agreement provided for in Paragraph "B", above, shall each be automatically cancelled and shall become null and void, and that all provisions of the said Option Agreement dated September 1, 1950 shall in that event remain in full force and effect without modification. When signed in duplicate by both NCG and KLOTZ, this letter shall constitute a binding agreement supplementing the Option Agreement between the same parties dated as of the 1st day of September, 1950. Negotiations between B.J. and the petitioner were concluded in early December 1952 and the terms of a settlement agreed upon. As a condition *37 to entering into a written agreement with the petitioner effectuating the terms of the settlement, B.J. required that the petitioner obtain from Klotz, an assignment to B.J. of his inventions and patent applications involved in the interference proceeding, which would be ready for delivery at the time the written agreement of settlement was executed. The pertinent provisions of the written contract between the petitioner and B.J. are as follows: ASSIGNMENT AGREEMENT THIS AGREEMENT entered into and and effective as of the 1st day of July, 1952, by and between NATIONAL CYLINDER GAS COMPANY, a Delaware corporation having its office and principal place of business at Chicago, Illinois (hereinafter referred to as NCG), and BYRON JACKSON CO., a Delaware corporation having its office and principal place of business at Los Angeles, California (hereinafter referred to as BJ CO.): WITNESSETH: WHEREAS, NCG has entered into a certain option agreement, dated as of September 1, 1950, with one Robert L. Klotz, (sometimes also known as Robert L. Klotz, Jr. and hereinafter referred to as KLOTZ), then a resident of Drums, Pennsylvania and now a resident of Conyngham, Pennsylvania, pursuant *38 to which NCG owns the option to acquire the entire right, title and interest in and to certain herein below identified applications for United States Letters Patent and in and to the inventions described therein, all as more fully set forth in the annexed copy of said option agreement, marked Exhibit A; and WHEREAS, BJ CO. desires to acquire the rights of NCG under the aforesaid option agreement and to acquire the aforesaid inventions and applications for United States Letters Patent, and NCG is willing to assign its rights as aforesaid to BJ CO. under the terms and conditions hereinafter set forth; NOW, THEREFORE, in consideration of the faithful performance by each party of the mutual covenants herein contained, the parties hereto agree as follows: I. DEFINITIONS (a) The term "jet perforating" wherever used in this agreement shall mean and include the formation of holes, usually less than one inch (1 inch) in diameter, in well casing or other well pipe, and the penetration of earth strata in the uncased portion of a well, in any direction except along the axis of the well, in a well which is being or has been drilled for or in connection with the production of fluids such *39 as oil, gas or water, by a process involving the use of one or more shaped charges. (b) The term "shaped charge" shall mean and include an explosive charge having one or more cavities therein, which may or may not be lined with a nonexplosive material, and by which the so-called "Munroe effect" or "jet effect" is obtained. (c) * * * II. ASSIGNMENT (a) NCG does hereby sell, assign, transfer and set over unto BJ CO., its successors and assigns, the entire right of NCG pursuant to the aforesaid option agreement dated as of September 1, 1950 to acquire by assignment the entire right, title and interest in and to the following applications for United States Letters Patent and in and to the inventions described therein, and any divisions, continuations, and substitutions thereof, and in and to any patents that may issue thereon and any reissues of such patents, the same to be held and enjoyed by BJ CO., its successors and assigns, as fully and entirely as the same could have been or would have been held and enjoyed by NCG if this assignment had not been made: Serial No. 729,654, filed February 19, 1947 for METHOD AND APPARATUS FOR DRILLING BOREHOLES, and Serial No. 729,655, *40 filed February 19, 1947 for APPARATUS FOR PERFORATING WELL CASINGS. (b) NCG hereby covenants and warrants that it has full right to convey the entire interest herein assigned and that it has not executed and will not execute any agreement in conflict herewith, and NCG further covenants that it will undertake to cause to be executed and delivered to BJ CO. promptly upon execution of this agreement any and all deeds, assignments, or other documents necessary to vest in BJ CO. the full and unimpaired legal and equitable title in and to the aforesaid inventions and applications for United States Letters Patent, free and clear of any and all claims, demands and encumbrances of any nature and from any source whatsoever. (c) NCG agrees that upon request of BJ CO. it will make all reasonable efforts to obtain the cooperation and assistance of the applicant, KLOTZ, in the further prosecution of the aforesaid applications and in any litigation involving any patents issuing thereon, including the execution of all necessary documents, the giving of testimony and otherwise disclosing to BJ CO. all pertinent facts pertaining to the subject inventions, and in performing any and all others acts *41 reasonably requested by BJ CO., at no cost to BJ CO., but at the expense of BJ CO. as to any travel, subsistence and disbursements incurred at the request of BJ CO., and which are reasonably necessary to implement the provisions of this Article II, subparagraph (c). (d) KLOTZ by his ratification of and assent to this agreement, covenants and agrees that he will faithfully perform the acts, execute the documents, and generally do everything reasonably necessary to implement the provisions of this Article II, subparagraphs (b) and (c), and further covenants and agrees that such performance by him shall not give rise to any claim, demand or other cause of action by him against BJ CO. other than as specifically set forth in said subparagraph (c). III. PAYMENT (a) In consideration of the above assignment, BJ CO. hereby agrees to pay to NCG an amount equal to four and three-quarters percent (4.75%) of the total of the following amounts: (1) All royalties received by BJ CO. from its licensees and from Welex Jet Services, Inc., a corporation of Texas, (hereinafter referred to as WELEX) for jet perforating operations performed by them in the United States from and after the effective *42 date of this agreement, it being understood and agreed that for the purposes of this agreement said royalties from WELEX shall be a calculated amount representing the same percentage of the net charges of WELEX for its jet perforating operations as is being paid by licensees of BJ CO. at the time of said operations; (2) So long as BJ CO. is receiving royalties from any licensee or from WELEX as set forth in item (1) above, a percentage of the net charges of BJ CO. for jet perforating operations performed by it in the United States from and after the effective date of this agreement, said percentage to be equal to the royalty rate being paid by licensees of BJ CO. at the time of said operations; said total to constitute the sum of items (1) and (2) above. (b) It is expressly understood and agreed between the parties hereto that NCG, by this agreement, has sold, assigned and transferred to BJ CO. all of its rights as set forth in Article II hereof for the consideration set forth in this Article III, subparagraph (a), and that nothing herein shall be construed to give to NCG any remainder or contingent or future interest, right, privilege or authority whatsoever with respect to *43 the rights hereby sold, assigned and transferred, or with respect to any licenses heretofore granted or hereafter granted by BJ CO. or WELEX to others for jet perforating services, or with respect to any jet perforating patents, patent applications, inventions or improvements, litigation involving the same, patent maintenance, licensing practices, or license maintenance of either BJ CO. or WELEX, or their successors in interest. IV. ACCOUNTING AND RECORDS (a) * * * (b) * * * V. PARTIES (a) The obligation of BJ CO. to pay the amounts set forth in Article III hereof shall be binding upon BJ CO., upon the successors and assigns of all or any part of its jet perforating business to the extent of the amounts payable hereunder on the business so assigned, and upon any party to whom BJ CO. may assign all or any part of its right to receive royalties from WELEX or from any of its Jet Perforating Licensees, to the extent of the amounts payable hereunder on the royalty rights so assigned. (b) In the event of termination of that certain agreement dated as of August 1, 1947, between WELEX and BJ CO., and of subrogation of WELEX to the rights of BJ CO. under Jet Perforating Licenses *44 granted by BJ CO. as provided in Article IX, Paragraph (d), of said agreement, the obligation of BJ CO. to pay the amounts specified in Article III hereof shall thereupon cease and WELEX shall assume the obligation to make the payments therein set forth based on royalties received by WELEX from any of said Jet Perforating Licensees and based on WELEX' own jet perforating operations. (c) It is expressly understood and agreed between the parties hereto that the consideration provided in Article III hereof shall be paid in its entirety to NCG and that neither BJ CO. nor WELEX, as the case may be, shall have any responsibility or obligation for payment of any portion of such consideration other than to NCG. VI. TERMINATION Unless sooner terminated under any of the foregoing provisions, the obligation of BJ CO. or WELEX, as the case may be, to pay to NCG the amounts set forth in Article III hereof shall continue for and during the valid life of any patent issuing on the aforesaid Application Serial No. 729,655, or if no patent should issue on said application, the valid life of U.S. Patent No. 2,494,256, to Muskat et al., which patent is presently involved in Interference No. 85,220 *45 with said application Serial No. 729,655. * * *
Annexed to this contract as Exhibit A and forming a part thereof was the abstract of the option agreement, which had been supplied by Klotz under Clause B of the letter of October 16, 1952. This agreement, hereinafter referred to as the Assignment Agreement, was executed by petitioner on December 4, 1952 and by B.J. on December 15, 1952. Klotz on December 6, 1952 and Welex Jet Services, Inc. on December 18, 1952 also signed the agreement. Their signatures followed a clause which read: The undersigned * * * hereby ratifies and assents to the foregoing Agreement and agrees to be bound by any and all obligations imposed on him by the provisions thereof. Simultaneously with and as a part of the agreement between petitioner and B.J. a supplemental letter agreement was executed which was not ratified by Klotz or Welex Jet Services, Inc. The important provisions of this letter were: We have executed and are submitting this agreement subject to the understanding, requested by your company, that we waive all right to the payments provided for in Article III, paragraph (a) of the NCG - BJ CO. Agreement dated July 1, 1952, for so *46 long as and only so long as any subsidiary of this company engaged in the business of "jet perforating" as defined in Article I of said agreement be not licensed under the applicable United States "jet perforating" patents which may be owned or controlled by BJ CO., or as to which BJ CO. has the right to grant licenses. The term "subsidiary" as used herein shall be understood to mean and include any company or corporation of which more than fifty percent (50%) of the voting shares of capital stock are owned or controlled, directly or indirectly, by this company. * * *
When the primary agreement between petitioner and B.J. was sent by letter on December 4, 1952 from petitioner to Klotz for his ratification, an assignment from Klotz to B.J. which had been prepared by petitioner in conformity with instructions from B.J. was also submitted to Klotz for his execution. Thereafter, when the petitioner submitted the primary agreement to B.J. for B.J.'s execution, copies of the assignment from Klotz were included with an assurance that the original assignment would be delivered to B.J. as soon as the petitioner received the executed copies from Klotz. Petitioner received the executed *47 copies from Klotz and sent them to B.J. on December 20, 1952. This assignment by Klotz read as follows: ASSIGNMENT LIBER 1234 PAGE 61 WHEREAS, I, ROBERT L. KLOTZ, sometimes also known as Robert L. Klotz, Jr., formerly a resident of Drums and now residing at Conyngham, both in the County of Luzerne and State of Pennsylvania, have made certain inventions pertaining to Jet Perforating and have filed applications for United States Letters Patent thereon as follows: Serial No. 729,654, filed February 19, 1947 for METHOD AND APPARATUS FOR DRILLING BOREHOLES; Serial No. 729,655, filed February 19, 1947 for APPARATUS FOR PERFORATING WELL CASINGS; and WHEREAS, BYRON JACKSON CO., a Delaware corporation having its principal place of business at Los Angeles, California, is desirous of acquiring the entire right, title and interest in and to the aforesaid inventions and patent applications and the Letters Patent to be granted and issued thereon. NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00) in hand paid to me, the receipt of which is hereby acknowledged I, the said ROBERT L. KLOTZ, do hereby sell, assign, transfer and set over unto the said Byron Jackson *48 Co., its successors and assigns, the entire right, title and interest in and to the above-identified Applications for United States Letters Patent Serial Nos. 729,654 and 729,655, and in and to the inventions described and claimed therein or intended to be described and claimed therein, and in and to each and every other invention heretofore made by me pertaining to Jet Perforating, as herein defined, excepting, however, the invention covered by any patent issuing on that certain application for United States Letters Patent Serial No. 729,657, filed February 19, 1947, for METHODS AND APPARATUS FOR SHOOTING WELLS, and in and to any and all Letters Patent to be granted and issued on said inventions and applications, not only for, to and in the United States of America but for, to and in all other countries, the same to be held and enjoyed by the said BYRON JACKSON CO., its successors and assigns, as fully and entirely as the same could have been or would have been held and enjoyed by me had this assignment not been made; and I hereby LIBER 1234 PAGE 62 authorize and request the Commissioner of Patents to issue said United States Letters Patent in accordance with this assignment. *49 I hereby covenant and warrant that I am the same person formerly and sometimes known as Robert L. Klotz, Jr., and that I have full right to convey the entire interest herein assigned and that I have not executed and will not execute any agreement in conflict therewith; and I further covenant and warrant that the subject matter hereby assigned is free and clear of any and all claims, demands and encumbrances of any nature and from any source whatsoever. The term "Jet Perforating" as used herein shall mean and include the formation of holes, usually less than one inch (1inch) in diameter, in well casing or other well pipe, and the penetration of earth strata in any direction in the uncased portion of a well which is being or has been drilled for or in connection with the production of fluids such as oil, gas or water, by a process involving the use of one or more shaped charges. The term "Shaped Charge" shall mean and include an explosive charge having one or more cavities therein, which may or may not be lined with a non-explosive material, and by which the so-called "Munroe effect" or "jet effect" is obtained. * * *
During the year 1953, petitioner received from B.J. the *50 sum of $69,408.62, in 1954 it received $87,437.06 from B.J. Petitioner paid Klotz $4,164.51 in 1953 and $5,246.23 in 1954. The petitioner computed its long-term capital gain as follows: 1953
1954
Receipts
$69,408.62
$87,437.06
Expenses: Klotz
$4,164.51
$5,246.23
Other
5,450.39
9,614.90
None
5,246.23
Gain
$59,793.72
$82,190.83
The Commissioner determined in his notice of deficiency that the $69,408.62 received in 1953 and the $87,437.06 received in 1954 were taxable as ordinary income; and further determined that the payments made to Klotz, and other expenses were the costs of acquiring the patent, and amortized such costs as follows: Costs
Amortized
Amount of Amortization
Incurred
From
1953
1954
$11,490.23
November 1, 1952
$542.85
$542.85
4,164.51
July 1, 1953
101.57
203.15
5,246.23
July 1, 1954
134.51
$644.42
$880.51
At the trial respondent conceded that it was the sale of a capital asset and therefore short-term capital gain rather than ordinary income. The respondent determined that the petitioner had expenses which are deductible from the amounts received from B.J. as *51 follows: 1953
1954
Receipts
$69,408.62
$87,437.06
Expenses: Klotz
$ 4,164.51
$5,246.23
Other
11,490.23
15,654.74
None
5,246.23
Gain
$53,753.88
$82,190.83
The payments by B.J. were the proceeds of a sale by the petitioner in December 1952, of the petitioner's ownership rights in certain inventions and patent application. These rights were acquired by the petitioner less than six months before they were sold. Opinion The sole issue to be resolved is whether net capital gains realized by the petitioner in 1953 and 1954, respectively, were taxable as short-term or as long-term gains under the provisions of section 117, Internal Revenue Code of 1939 and section 1222, Internal Revenue Code of 1954. The petitioner contends that the assignment by it to B.J. in December 1952, was in fact and law an assignment and sale of an option to purchase certain invention and patent applications granted to it by the 1950 Option Agreement with Klotz and therefore was a sale of a capital asset held for a period of more than six months and the gain was taxable as long-term capital gain. Petitioner contends in the alternative *52 that if any rights were acquired by petitioner from Klotz in 1952 such rights were acquired by the oral agreement of April 1952, and the agreement dated October 16, 1952, constituted merely a formal affirmation of the April agreement and therefore, if any rights were sold to B.J. in December 1952, they were rights acquired in April 1952 and held for more than six months and gave rise to long-term capital gain. The respondent contends that the petitioner in fact and substance sold to B.J. in December 1952, the ownership rights in the inventions and patent applications, that these rights were acquired by petitioner shortly before and less than six months before they were sold and therefore short-term capital gain resulted. In the alternative respondent contends that if we find that the sale to B.J. was the sale of an option, it was an option acquired by petitioner on or after October 16, 1952, and held less than six months before sale, therefore the gain was short-term capital gain. In Louis D. Blick, 31 T.C. 611 (1958), affd. 271 F. 2d 928 (C.A. 3, 1959), we held that *53 "The question as to whether or not petitioner sold options as he claims is essentially one of fact." Therefore in order to resolve the question presented it will be necessary to analyze the relevant facts. The Assignment Agreement states that its purpose is to sell an option to certain inventions and patent applications. However, this statement is contradicted by another provision in which the petitioner "covenants that it will undertake to cause to be executed and delivered * * * all deeds, assignments, or other documents necessary to vest in BJ CO. the full and unimpaired legal and equitable title * * *." In order to comply with this provision it would be necessary for the petitioner to exercise the option with Klotz. Petitioner denies that it exercised the option. There is no evidence that the option was ever exercised by B.J. Nor is there evidence that the option was ever formally exercised by anyone under the terms of the 1950 Agreement which required that written notice be sent by registered mail to Klotz. The facts show that B.J. conditioned its execution of the Assignment Agreement upon the procurement by the petitioner of an executed assignment of the inventions and patent *54 applications from Klotz to B.J. The importance of this prearranged assignment from Klotz to B.J. is indicated by the testimony of Allen Hambly, patent counsel for B.J.: Q. Would Byron Jackson Company have agreed to the purchase from National Cylinder Gas of an option to purchase held by National Cylinder Gas from Klotz without having any assignment, any prearranged assignment from Klotz to Byron Jackson being prepared and ready for transmittal to you? A. Whether the management of Byron Jackson would have done that I can't say, but I wouldn't have recommended it. Q. You would have recommended it? A. I would not have recommended it. It was required that that assignment would be previously executed by Klotz. Q. You aren't sure as to what the management of Byron Jackson would do under such circumstances? A. I believe that they would probably follow my recommendation since it is a patent matter. All payments were made to petitioner who then paid Klotz. Even though Klotz testified that he approved of this payment arrangement it can clearly be seen from the evidence that the reason B.J. paid the petitioner was not because Klotz gave his approval to this form of transaction, *55 but rather because it was the petitioner upon whom B.J. relied for the transfer of the inventions and patent applications. This is demonstrated by petitioner's convenant in the Assignment Agreement that it would "undertake to cause to be executed and delivered * * * all deeds, assignments, or other documents necessary" and the requirement by B.J. that the petitioner obtain an assignment "previously executed" from Klotz to B.J. before it would execute assignment agreement. When the covenant by the petitioner is considered in conjunction with the required prearranged execution of an assignment of the rights from Klotz to B.J., the form of payment, and the fact that B.J. never exercised the option, we believe the only conclusion that can be drawn is that it was not the sale of an option to B.J. and an exercise of that option by B.J., but rather in substance a "unitary transaction" that is, a sale of the inventions and patent applications by petitioner. Since we think the Assignment Agreement was in fact a sale and was not the first step of a two-step transaction, the option had to be informally exercised by the petitioner some time prior to December 15, 1952, the execution date of the *56 Assignment Agreement. Petitioner by letter under date of October 16, 1952 advised Klotz that a settlement with B.J. was near and they formalized their prior oral agreement. We think the reasonable inference is that the option was exercised sometime between October 16 and December 15, 1952. The fact that the petitioner never held legal title, the assignment of the inventions and patent applications being from Klotz to B.J. directly, has no effect on our holding that the option was exercised by the petitioner. We dealt with a similar situation in H. G. Butler, 43 B.T.A. 1005 (1941). In that case, Butler leased a mineral right with an option to purchase the fee in five years for $5,000 from Crittenden. Butler then gave to Lay, as agent for Ball, an option to purchase the fee in 90 days for $36,000. Lay notified Butler within the 90 days that he was exercising the option and put a check for the purchase price in escrow. Butler paid Crittenden who executed a general warranty deed to Ball. The escrow agent then delivered the check for $36,000 to Butler. We held that Butler sold the fee to Ball even though the conveyance was directly from Crittenden to Ball. We said, at *57 p. 1008: Petitioner argues that, while he had the right to exercise his option to purchase the mineral rights from Crittenden, he "never took title to the property" and so he sold something other than title to the mineral rights to Lay and his principal, Ball. Petitioner appears to place reliance upon the factor that the deed to the mineral rights was from Crittenden to Ball. It is true that there were not two deeds, one from Crittenden to petitioner and one from petitioner to Ball, but in view of the fact that petitioner apparently exercised the option he had by giving his check for $5,000 to Crittenden, and that Ball did not pay anything to Crittenden, it appears that all parties concerned eliminated one step in an economy of effort and that the deed from Crittenden to Ball was in reality a deed on behalf of petitioner, conveying title which he had acquired under exercise of his option, to Ball, who exercised the option he obtained from petitioner. In our opinion, the substance rather than the form of the transaction is controlling. See also Barber v. United States, 215 F. 2d 663 (C.A. 8, 1954). In Barber, supra, the Court in reaching the conclusion *58 that a sale and not merely the assignment of an option had occurred said, at 667: the fruits of business transactions are not required to be viewed for tax purposes on the basis of practical aspects or results alone, if they involve the creation or the use of legal realities, in both form and substance, on which a different and greater tax liability can exist. The taxing authorities have the general right to assess income taxes on the basis of the sound legal and equitable realities which have existed in the taxpayer's situation. They may also at times, of course, pierce the mere form of apparent legal reality and examine the practical or economic actualities of what the taxpayer has done, where these outweigh the substance of the legal reality. But the choice of the tax course to be applied in any such situation, where there may be a right to a choice, is the Government's, not the taxpayer's. We hold that in substance the petitioner exercised the option under the 1950 Agreement with Klotz and therefore the Assignment Agreement was a sale of the inventions and patent applications and not *59 merely the assignment of an option. In light of our holding that the Assignment Agreement was a sale we must now consider the petitioner's alternative contention that the rights acquired from Klotz were acquired by the oral agreement of April 1952 and that the agreement dated October 16, 1952, constituted merely a formal affirmation of the April agreement. Assuming arguendo that the April agreement was a valid contract, the petitioner's contention still cannot prevail. It is clear from the evidence that it was the intention of the parties that the contract remain executory until a settlement was negotiated with B.J. This intent is demonstrated by the correspondence between the parties. The letter under date of June 4, 1952 from Klotz to Boynton reads as follows: I am very glad to have an agreement between us. You may take this letter as my informal acceptance of terms providing for a straight 6% of anything received from B-J on this matter, if a settlement is made with them, and from my part of which no deduction would be made on account of expenses incurred. I suggest you do not bother to draw up a new agreement for me to sign unless a settlement is made with B-J, since *60 it seems to me the old agreement should remain except in case of a B-J settlement. However, I'll stand ready to sign any time we get favorable news on the B-J thing and here's hoping you will work it somehow. The following reply dated June 9, 1952 was sent from Boynton to Klotz: * * *
I think that with our agreement as represented by the exchange of correspondence concerning this, it will be unnecessary to make a formal contract, or to modify the present contract, until actual settlement is in sight. It is always possible that the details of the settlement will involve other things that would make any contract we draw up now inappropriate in some respects, therefore your idea that we leave it on this basis is a good one. * * *
The language of the parties shows clearly that the settlement with B.J. was a condition precedent which had to be fulfilled before the contract became binding. In Skelly Oil Co. v. Wickham, 202 F. 2d 442 (C.A. 10, 1953) the Court of Appeals said: The coming into being of the rights of a party under a contract can be made to depend on the *61 happening of a future event or condition. See also Friedman v. Decatur Corp., 135 F. 2d 812 (C.A.D.C., 1943), Williston on Contracts, Rev. Ed., Sec. 666A. It follows that the rights acquired from Klotz were not acquired until sometime after October 16, 1952 and therefore having been held less than six months before sale, the gain realized was short-term capital gain. The respondent's determination is sustained. Decision will be entered under Rule 50. *
Footnotes
*. The prior decision, "Decision will be entered for the respondent", was vacated and the above decision inserted, per court order signed by Judge Tietjens↩ and dated December 30, 1960.